**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SUGARFINA, INC., | Case No. 19-11973 (MFW) (Jointly Administered) |
| Debtor. | |
| SUGARFINA, INC., | |
| Plaintiff, | Adv. Pro. No. 19-_____ |
| vs. | |
| GLJ, INC. and MJC CONFECTIONS LLC, | |
| Defendants. | |

**COMPLAINT**

Debtor, Sugarfina, Inc. ("Plaintiff" or "Sugarfina"), by and through its undersigned counsel, hereby brings this Complaint against defendants GLJ, Inc. ("GLJ") and MJC Confections LLC ("MJC" and collectively with GLJ, "Defendants" or "MNS") as follows:

**NATURE OF THE ACTION**

1.     This adversary proceeding is brought pursuant to and under Federal Rules of Bankruptcy Procedure 7001, *et seq.* (the "Bankruptcy Rules") for turnover, in accordance with section 542 of title 11 of the United States Code (the "Bankruptcy Code"), of property belonging to Sugarfina.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.      Venue is proper in this proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**THE PARTIES**

4.      Plaintiff is a Delaware corporation, having its principal place of business at 3915 West 102nd Street, Inglewood, California 90303.

5.      Defendant GLJ, Inc. is a New York corporation having its principal place of business located at 999 South Oyster Bay Road, Building #500, Bethpage, New York 11714.

6.      Defendant MJC Confections LLC is a New York limited liability company having its principal place of business located at 999 South Oyster Bay Road, Building #500, Bethpage, New York 11714.

**BACKGROUND**

*A.  Debtor's Bankruptcy Cases*

7.      On September 6, 2019 (the "Petition Date"), Plaintiff and two of its affiliates filed voluntary Chapter 11 petitions in this Court, thereby commencing the above-captioned cases, which are being jointly administered pursuant to an Order of this Court entered on September 9, 2019.

8.      As of the Petition Date, Plaintiff and its affiliates were authorized to continue to operate their businesses and manage their properties as debtors in possession ("DIP") pursuant to Bankruptcy Code sections 1107(a) and 1108.

9.      No trustee or examiner has been requested in the Chapter 11 case.  An official committee of unsecured creditors has been appointed.

### B.  Debtor's Business Operations

10.      Sugarfina owns and operates a specialty retail and wholesale business in the United States and internationally.

11.      Sugarfina is an iconic candy and confectionary brand with a uniquely fresh, fashionable, and experiential approach to gourmet confections.  With the creation of a "candy store for grownups," Sugarfina has gained a strong and loyal customer following, through constant creation and innovation focused on distinctive product presentation and invention of fresh new candy offerings that delight and surprise.  Its offerings are sourced from the finest candy makers in the world and include such iconic varieties as Champagne Bears®, Peach Bellini®, Sugar Lips®, Green Juice Bears®, and Cold Brew Bears™.  Packaging design is also central to Sugarfina's edge—listed among "The World's Most Innovative Companies" in 2018 by Fast Company Magazine, Sugarfina's presentation centers around the invention of the distinct Candy Cube™, Candy Bento Box®, and Candy Wall™.  The result is an experience that is unique, attracting a significant social media following and a series of successful co-branding opportunities with well-known labels such as Disney, Barbie, Nintendo, Tito's Vodka, Casamigos, and The Honest Company.

12.      Sugarfina operates an "omnichannel" business, involving design, assembly, marketing, and sale of confectionary items through a retail fleet of 44 "Candy Boutiques," including 11 "shop in shops" within Nordstrom's department stores, a wholesale channel, e-commerce, international franchise, and a corporate/custom channel.  In 2018, Sugarfina generated more than $47 million in net sales.

### C. MNS's Receipt of Sugarfina's Property

13.     Sugarfina and MNS entered into a Services Agreement dated August 11, 2017 (the "Services Agreement"), a true and correct copy of which is annexed hereto as <u>Exhibit A</u>.

14.     Pursuant to the Services Agreement, MNS was required to provide services (the "Services") to Sugarfina including, among other things, the storage of raw candy and packaging, and assembly of finished product.

15.     In connection with the Services, MNS came into possession of numerous items of Sugarfina's property, including "Merchandise (defined as "confections, candy, food items, containers, ancillary products, displays, store fixtures, marketing materials, promotional materials and other similar items from time to time designated by SGR"), "SGR Products" (defined as "[t]he final products containing the Merchandise"), "Bailed Equipment" (defined as "equipment, machinery, and supplies to be used in connection with the Services [that is delivered to MNS]"), and a "Racking System" (defined as "a racking system [erected] for SGR's products"). The Merchandise, SGR Product, Bailed Equipment, and Racking System are collectively referred to herein as the "Sugarfina Property."

16.     Through the Services Agreement, MNS specifically disclaimed any possessory or other rights or interest in the Sugarfina Property.

17.     With respect to the Merchandise and the SGR Products, section 10(c) of the Services Agreement provided as follows:

<u>Merchandise Title</u>. All legal title to the Merchandise and the SGR Product shall be vested in and held by SGR, regardless of location and state of said Merchandise or SGR Product. MNS shall be deemed a bailee for such Merchandise and the SGR Product, and shall segregate the Merchandise and SGR Product from any of its property or those of any third party. MNS shall affix the Merchandise and SGR Product with labels sufficient to ensure that a reasonable person can determine it is owned by SGR, and shall not make any representations or statements to third parties regarding any claim to ownership or title over the Merchandise or SGR Product.

> *To the extent applicable, MNS hereby waives and relinquishes any claims or rights that may arise, by operation of law or otherwise, to assert a possessory interest in or lien on the Merchandise or SGR Product by nature of MNS' possession or control of the Merchandise or SGR Product.* With respect to transportation terms of title, MNS has no agency, representative, power of attorney, or other ability to modify, cause to modify, provide, provide in absence of, or otherwise affect the transportation terms of title negotiated, or intended to be negotiated, by SGR, for either past, present, or future terms. Prior written approval on an incident-by-incident basis is required before MNS may create or change the transportation terms of title. MNS shall use its best effort to receive Merchandise from carriers, to prepare shipments for carriers in a manner to avoid damage to Merchandise and SGR Product, to promptly document and notify SGR of damages, to collect carrier and freight documents, and to sign for acknowledgement of receipt or shipment of Merchandise and SGR Product.

Services Agmt. § 10(c) (emphasis added).

18.    With respect to the Bailed Equipment, section 8(c) of the Services Agreement provided as follows:

> Equipment Delivery and Use. SGR may, from time to time, deliver to MNS equipment, machinery, and supplies to be used in connection with the Services (the "Bailed Equipment"). *MNS shall not have any title or interest in the Bailed Equipment, and shall hold and use such Bailed Equipment as a bailee only.* Upon delivery of the Bailed Equipment to MNS, SGR shall also provide MNS with any applicable lease agreements or security agreements governing use and/or possession of the Bailed Equipment. MNS shall take all steps reasonably required to maintain the Bailed Equipment, including but not limited to those steps required under such lease agreements or security agreements; provided, however, that SGR shall reimburse MNS for the out-of-pocket and reasonable costs of such maintenance, unless the need for maintenance is caused by MNS. MNS shall segregate the Bailed Equipment from all other similar equipment, and affix it with labels sufficient to ensure that a reasonable person can determine it is owned by SGR. MNS shall not make any representations or statements to third parties regarding any claim to ownership or title over the Racking System. MNS shall use the Bailed Equipment only for purposes of performing the Services, and may not use it to benefit any third party without SGR's express written consent.

Services Agmt. § 8(c) (emphasis added).

19.    With respect to the Racking System, section 8(d) of the Services Agreement provided as follows:

11179900/1

> Racking System Use. ***MNS shall not have any title or interest in the Racking System, and shall hold and use such Racking System as a bailee only.*** MNS shall take all steps reasonably required to maintain the Racking System. MNS shall affix the Racking Systems with labels sufficient to ensure that a reasonable person can determine it is owned by SGR, and shall not make any representations or statements to third parties regarding any claim to ownership or title over the Racking System. MNS shall use the Racking System only for purposes of performing the Services, and may not use it to benefit any third party without SGR's express written consent.

Services Agmt. § 8(d) (emphasis added).

20.     As set forth above as well as in the Service Agreement, MNS had no right, title or interest in any of the Sugarfina Property.

21.     Sugarfina estimates that the value of the Sugarfina Property exceeds $2.8 million.

### D. MNS Agreed to Turn Over the Sugarfina Property upon Termination

22.     Section 6(d)(i) imposes a number of obligations on MNS upon the termination of the Services Agreement, including requiring that "MNS shall take commercially reasonable steps to cooperate with and otherwise facilitate the transfer of Merchandise, SGR Product, the Bailed Equipment, and the Racking System, to SGR of its designee(s), in order to minimize impact, delay, or cost to SGR's operations and/or supply chain . . . (the 'Transition Obligations') . . . ."

23.     Under Section 6(d)(i), "MNS shall perform the Transition Obligations without regard to the reason for the expiration of the Term."

24.     Importantly, Section 6(d)(i) further provides that "[f]or purposes of this section, SGR's determination that the Term has expired . . . shall be conclusive. MNS hereby waives, relinquishes, and forever disclaims any claims or arguments to contest, oppose, or otherwise hinder SGR's determination that the Term has expired."

### E. MNS Doubled Down on its Waiver of Rights to the Sugarfina Property

25.     Over and above the waivers and agreements provided in the Services Agreement, MNS provided similar assurances and waivers to Sugarfina's lenders. Specifically, in connection

6

with the Services Agreement, MNS entered into (i) that certain Warehouseman's Release and Waiver Agreement, dated October 2, 2018 (the "Avidbank Lender Release"); and (ii) that certain Warehouseman's Release and Waiver Agreement, dated January 2019, with Goldman Sachs Specialty Lending Holdings, Inc. (the "Goldman Lender Release" and collectively with the Avidbank Lender Release, the "Lender Releases").  True and correct copies of each of the Lender Releases are annexed hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectfully.

26.     By the Lender Releases, MNS further contractually acknowledged that it has no rights to the Sugarfina Property.  For example, Section 1 of the Lender Releases provide that MNS waived, released, and relinquished all right, title, interest and claim to Sugarfina's Property:

> The Warehouseman [i.e., MNS] hereby waives, releases and relinquishes to the Bank all right, title, interest and claim which Warehouseman has or may in the future have in, to or against any personal property (including, without limitation, all Inventory, equipment, goods, books and records), whether now or hereafter acquired by Borrower and located at any time in the Premises (collectively, the "Goods").

27.     Similarly, Section 2 of the Lender Releases provide that the Sugarfina Property is only a bailment to MNS, and Sugarfina shall retain title to the Sugarfina Property at all times:

> The Warehouseman [i.e., MNS] agrees that the Goods are bailed to the Warehouseman solely for storage and processing purposes and title to such Goods shall at all times remain in the Borrower.  The Warehouseman shall have no right, title or interest therein and will not, by storing or processing same, acquire any right, title or interest therein.

28.     Further, Section 4 of the Lender Releases provide that MNS waived any and all claims, liens, charges and encumbrances in, to, or against any of Sugarfina's Property:

> The Warehouseman waives any and all claims, liens, charges and encumbrances which it now has or may at any time hereafter acquire (whether arising under applicable common law or statute, by contract with the Borrower, or otherwise) in, to, or against any of the Goods in its possession at the Premises.  The Warehouseman will not encumber, grant a security interest in, or dispose or sell any of the Goods; provided, however, that Warehouseman may dispose of Goods at the request of Borrower in the ordinary course of business.

29.     And, Section 7 of the Lender Releases provides for no offsets:

So long as this Agreement shall remain in effect, the Warehouseman agrees that it shall not offset or apply any amounts due and owing by the Warehouseman to the Borrower against any indebtedness, obligation, or other amount(s) owed to the Warehouseman by the Borrower, whether arising in the ordinary course of business or otherwise, except as described in number 5 (5) of this Agreement.

### F.  Termination of the Services Agreement

30.     Pursuant to Section 23(e) of the Services Agreement, Sugarfina terminated the Services Agreement effective July 17, 2019, upon the delivery of the Termination Intent Notice, dated July 16, 2019 (the "Termination Intent Notice").  A true and correct copy of the Termination Intent Notice is annexed hereto as Exhibit D.

31.     While MNS alleges that Sugarfina's termination of the Services Agreement was improper, it is undisputed that Sugarfina is no longer having MNS perform services pursuant to the Services Agreement.[1]

### G.  MNS Has Refused to Return the Sugarfina Property

32.     By the Termination Intent Notice, Sugarfina reminded MNS of its obligations under the Services Agreement's Transition Obligations to return all Sugarfina Property in MNS's facilities.  See Exh. D.

33.     By letter dated July 22, 2019 from the undersigned firm to MNS's then-counsel, Sugarfina again reminded MNS of its obligations under the Services Agreement's Transition

---

[1]     In the proceeding *GLJ, Inc. and MJC Confections LLC v. Sugarfina, Inc.*, Civil Action No. 2:19-cv-04970-ARR-RML (E.D.N.Y.), filed on August 30, 2019 (the "MNS Action"), MNS contends that Sugarfina's termination of the Services Agreement was improper and that Sugarfina breached the Services Agreement and the implied duty of good faith and fair dealing.  The MNS Action is stayed by reason of 11 U.S.C. § 362(a), notice of which will be filed with that court shortly. Plaintiff notes that it has significant counterclaims against MNS in any civil proceeding relating to the termination of the Services Agreement, and reserves all rights relating to such claims and any all claims and defenses applicable to the MNS Action.

Obligations to return all Sugarfina Property to Sugarfina.  A true and correct copy of this letter is annexed hereto as Exhibit E.

34.    By letter (incorrectly) dated August 2, 2019, which was sent on August 1, 2019, from the undersigned firm to MNS's new counsel, Sugarfina informed MNS of its intention to pick up the Sugarfina Property from MNS on August 5, 2019.

35.    Also on August 1, MNS's new counsel (and MNS's counsel in the MNS Action) responded by email and informed Sugarfina that "[a]bsent a Court Order, I can assure you that your client will pick up nothing—absolutely nothing—from MNS' [*sic*] and that law enforcement will be notified should your client attempt to do so."  A true and correct copy of this email is annexed hereto as Exhibit F.

36.    After this bankruptcy proceeding was commenced, by letter dated September 6, 2019, Sugarfina informed MNS that, pursuant to sections 362(a)(3), 362(a)(6), and 542(a) of the Bankruptcy Code, MNS is required to turn over possession of the Sugarfina Property (the "Turnover Letter").  A true and correct copy of this letter is annexed hereto as Exhibit G.

37.    MNS has not responded to the Turnover Letter, nor has it turned over the Sugarfina Property to Sugarfina.

### H.  The Sugarfina Property is Urgently Needed for the Debtors' Continued Operations

38.    MNS is holding, and refusing to produce, over 237 pallets of raw candy, in addition to packaging and finished product.  The Debtors urgently require access to this Sugarfina Property in order to perform with respect to its budgetary requirements and continue operations in these cases.  Among other things, the Debtors' operations are running desperately low on empty cubes and some of the raw candy that MNS is holding – items that cannot be purchased from a vendor in time to satisfy the Debtors' production needs.

9

39.     Specifically, if MNS does not release to Sugarfina the empty cubes in its possession, Sugarfina estimates that by October 15, 2019, it will run out of empty cubes, and its ability to process new orders will be greatly limited.

40.     The replacement cost of new cubes is estimated to be $694,000.00.

41.     Moreover, Sugarfina has already been damaged by MNS's refusal to comply with the Turnover Obligations set forth in the Services Agreement.  Specifically, it had to spend $77,000.00 to expedite an order of Champagne Bears®, and $79,000.00 on an initial order of empty cubes, for a total of $156,000.00.

42.     If the Debtors do not gain access to the Sugarfina Property as soon as possible  they run a material risk of missing projected sales, causing a default under their DIP Credit Facility[2]. In addition, the Debtors' current proposed Stalking Horse APA[3] provides for a deduction in the purchase price if the Debtors' inventory values do not satisfy a specific threshold.  If the Debtors do not gain access to the Sugarfina Property immediately, they are projecting to fall below that threshold, such that the purchase price paid for the Debtors' assets may be materially reduced.

43.     In addition to refusing to provide Sugarfina with access to the Sugarfina Property, in contravention of Services Agreement and the Lender Releases, MNS has also threatened to take steps that would destroy or reduce the value of the Sugarfina Property.  For example, by letter dated July 17, 2019 to Sugarfina, MNS, by its then-counsel, stated that "...until all outstanding invoices are immediately paid in full and MNS is provided with assurances to its satisfaction that it will be made whole, MNS reserves the right to take all necessary steps to mitigate its damages

---

[2]     This term is defined in the Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, etc. [Docket No. 71].

[3] This term is defined in the Declaration of Adam Meislik in Support of Debtors' Motion for Entry of Interim and Final Orders Authorizing Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364, and Use of Cash Collateral (the "Meislik Decl.")[Docket No. 62].

caused by Sugarfina, including shutdown of all operations, electricity and other utilities."  A true and correct copy of this letter is annexed hereto as <u>Exhibit H</u>.  Such a shutdown is likely to result in the destruction of Sugarfina's Merchandise and the SGR Product, which are perishable confections, candy, and food items.

## COUNT I

### (Turnover of Property Pursuant to 11 U.S.C. § 542)

44.    Plaintiff repeats and re-alleges paragraphs 1 through 43 as though fully set forth herein.

45.    The Sugarfina Property is property of the estate of Sugarfina under Bankruptcy Code section 541(a).

46.    Defendants remain in possession of the Sugarfina Property, despite demand for its return.

47.    The Sugarfina Property is property that Sugarfina may use under Bankruptcy Code section 363.

48.    Under Bankruptcy Code section 542(a), an entity in possession of property that the trustee (or debtor in possession under section 1107) may use "shall deliver" such property to the trustee.

49.    Under Bankruptcy Code section 542(a), an entity in possession of property that the trustee (or debtor in possession under section 1107) may use "shall . . . account for" such property.

50.    The Sugarfina Property is not of inconsequential value to Sugarfina's estate. Rather, it is essential to its ongoing operations.

51.    The Plaintiff is entitled to the return of the Sugarfina Property.

11179900/1

## COUNT II

## (Violations of 11 U.S.C. §§ 362(a) and (a)(6))

52.     Plaintiff repeats and re-alleges paragraphs 1 through 51 as though fully set forth herein.

53.     "[A] petition…operates as a stay, applicable to all entities, of,,,(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;…[and] (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title… ."  11 U.S.C. §§ 362(a)(3) and (a)(6).

54.     By the Turnover Letter, which was dated September 6, 2019, and sent to MNS and its council by certified mail, return receipt requested (and by email to counsel for MNS), Sugarfina informed MNS that, pursuant to sections 362(a)(3), 362(a)(6), and 542(a) of the Bankruptcy Code, MNS is required to turn over possession of the Sugarfina Property.  *See* Exh. G.

55.     MNS has not responded to the Turnover Letter, nor has it turned over the Sugarfina Property to Sugarfina.

56.     This failure by MNS to turn over the Sugarfina Property constitutes a willful violation of the automatic stay, which has caused Sugarfina immediate and irreparable harm as set forth herein.

57.     Sugarfina seeks actual damages, including legal fees and expenses, as well as punitive damages, as a result of MNS's knowing and willful violation of the automatic stay.

## COUNT III

## (Section 105 Injunction)

58.    Plaintiff repeats and re-alleges paragraphs 1 through 57 as though fully set forth herein.

59.    A bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

60.    A Bankruptcy Court may, therefore, in its discretion, issue injunctive relief under section 105 of the Bankruptcy Code in order to restrain activities that threaten the policies underlying the bankruptcy process and the administration of a debtor's estate or impair the court's jurisdiction with respect to the case before it.

61.    This Court's issuance of an injunction barring MNS from destroying the Sugarfina Property and ordering MNS to turnover the Sugarfina Property is necessary in order to preserve and facilitate the orderly administration of the debtor's estate.

62.    Without the Court's issuance of an injunction, Sugarfina will run a material risk of missing projected sales, causing a default under their DIP Credit Facility.  In addition, the Debtors' current proposed Stalking Horse APA provides for a deduction in the purchase price if the Debtors' inventory values do not satisfy a specific threshold.  If the Debtors do not gain access to the Sugarfina Property immediately, they are projecting to fall below that threshold, such that the purchase price paid for the Debtors' assets may be materially reduced.

63.    The requested injunctive relief will serve the public interest by allowing this Court to treat all general unsecured creditors equally.

64.     Injunctive relief pursuant to section 105 of the Bankruptcy Code enjoining MNS from destroying the Sugarfina Property and ordering MNS to turn over the Sugarfina Property is therefore necessary and appropriate.

## RESERVATION OF RIGHTS

65.     Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff might have against Defendants, on any and all grounds, as allowed under law or in equity.  Nothing contained in this Complaint shall be construed as a waiver of Plaintiff's rights to object to any scheduled claim or any proof of claim filed by Defendants.  Accordingly, Plaintiff reserves the right to object, on any and all grounds, to any scheduled claim or proof of claim asserted by Defendants.  For each objection to a claim, a separate notice will be given and a separate hearing will be scheduled.

## RELIEF REQUESTED

WHEREFORE, Sugarfina prays that this Court enter judgment as follows: (i) turnover of the Sugarfina Property; (ii) disallowance of any claim Defendants may have in the Debtors' bankruptcy cases pursuant to Bankruptcy Code section 502(d) unless the Sugarfina Property is turned over; (iii) exercise by the Court of its powers under section 105 of the Bankruptcy Code to issue an injunction enjoining MNS from destroying the Sugarfina Property and ordering MNS to turn over the Sugarfina Property; (iv) all actual damages, including legal fees and expenses, as well as punitive damages as a result of MNS's knowing and willful violation of the automatic stay; (v) all costs under applicable law; and (vi) such other and further relief as the Court deems just and proper.

Dated:  September 19, 2019            **MORRIS JAMES LLP**

           */s/ Eric J. Monzo*
           Eric J. Monzo (DE Bar No. 5214)
           Brya M. Keilson (DE Bar No. 4643)
           500 Delaware Avenue, Suite 1500
           Wilmington, DE  19801
           Telephone:  (302) 888-6800
           Facsimile:  (302) 571-1750
           E-mail:  emonzo@morrisjames.com
           E-mail:  bkeilson@morrisjames.com

           and

           **FISHERBROYLES LLP**
           Christina H. Bost Seaton, Esquire
           445 Park Avenue, Ninth Floor
           New York, NY 10022
           Telephone:  (203) 887-4665
           E-mail:  Christina.BostSeaton@fisherbroyles.com

           *Proposed Special Litigation Counsel to the Debtors*